(No. 87116.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. JOHNNIE WRIGHT, Appellant.

*Opinion filed February 17, 2000.—Modified on denial of rehearing
October 2, 2000.—Further rehearing denied November 27, 2000.*

FREEMAN, J., specially concurring.

MILLER, J., joined by HARRISON, C.J., concurring in part and dissenting in part.

BILANDIC, J., also concurring in part and dissenting in part.

Michael J. Pelletier, Deputy Defender, and Michael H. Orenstein, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Kenneth T. McCurry and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Johnnie Wright, was the owner of J&J Scrap Auto Wrecking Company, an auto parts recycling business. On January 25, 1996, auditors from the Secretary of State's office arrived at defendant's business, reviewed documents in his business office, and took an inventory of the vehicles in the lot surrounding the office. As a result of this audit, defendant was placed under arrest and charged with two counts of possession of a stolen motor vehicle (see 625 ILCS 5/4—103(a)(1) (West 1996)), 27 counts of failure to keep records (see 625 ILCS 5/5—401.2(a), (i) (West 1996)), and 25 counts of possession of title without complete assignment (see 625 ILCS 5/4—104(a)(2) (West 1996)).

Following a bench trial, the circuit court of Cook County found defendant not guilty of the possession of a stolen motor vehicle charges and not guilty of two of the counts of failure to keep records. The circuit court found defendant guilty of the remaining charges of failure to keep records and possession of title without complete assignment.

On appeal, the appellate court reversed defendant's convictions because it found that the circuit court had failed to consider the mental state required to establish the offenses of failure to keep records and possession of title without complete assignment. The appellate court ordered the cause remanded for a limited nonevidentiary hearing for the circuit court to apply the appropriate mental state to the existing record. 302 Ill. App. 3d 128. We granted defendant's petition for leave to appeal. 177 Ill. 2d R. 315(a).

We hold that defendant's convictions for possession of title without complete assignment must be reversed because the evidence at trial was insufficient to establish the mental state required for a violation of section

4—104(a)(2). We also reverse defendant's convictions for failure to keep records because we find that section 5—401.2 of the Illinois Vehicle Code is unconstitutional on due process grounds.

## BACKGROUND

At defendant's trial, Russell Hoekstra, an auditor for the Special Audit Team of the Secretary of State's office, testified that, on January 25, 1996, he and two other auditors conducted an audit at J&J Scrap Auto Wrecking Company (J&J) in Blue Island, Illinois. When the auditors arrived at the J&J office at about 9 a.m., they spoke to defendant, who identified himself as the owner of the business. Hoekstra informed defendant that they were there to conduct an inspection of his business. He asked defendant for his license, his police book, and any other records. Defendant provided Hoekstra with his police book. He told Hoekstra that he could not find the titles for his vehicles but that his secretary would be able to find them when she returned from an errand. Defendant also gave Hoekstra a 1995 license, which listed him as the only owner of J&J. When asked about his 1996 license, defendant stated that he had applied for it but that he had not received it or could not find it.

Hoekstra then informed defendant that an inventory would be taken of all of the vehicles in the J&J lot and that the vehicles would be matched to the paperwork defendant provided. According to Hoekstra, the south and north boundaries of the J&J lot were each marked by a row of truck trailers. These boundaries were approximately 225 feet apart. The office was near the front of the lot and the rear of the lot was marked by railroad tracks about 600 or 700 feet behind the office. Hoekstra acknowledged that defendant's 1995 license indicated that the lot size was only 50 feet by 250 feet, but he stated that defendant had told him that the trailers were the north boundary of the J&J lot. An inspection by the

Secretary of State's office and defendant's 1996 license described the property size as four acres.

During the course of their inventory and inspection of defendant's records, the auditors discovered several irregularities. Hoekstra testified that they learned that two of the vehicles included in their inventory had been reported stolen. One of these vehicles, a 1987 blue Ford Taurus station wagon, was located approximately 150 yards behind the J&J office and 20 feet from the trailers marking the south boundary of the lot. The other car, a white 1987 Ford Escort, was located approximately 20 yards behind and 40 to 50 feet north of the Taurus.

Hoekstra asked defendant whether all of the vehicles in the J&J lot were his. Defendant responded that one car, his employee's car, did not belong to him. According to Hoekstra, defendant did not tell him that any of the vehicles in his lot belonged to James Crumb. When Hoekstra specifically inquired about the stolen vehicles, defendant told Hoekstra that a towing company had brought the Taurus and the Escort to the lot. Defendant gave Hoekstra a name of the towing company, but Hoekstra did not try to contact the company. Hoekstra did not remember defendant calling someone named Jim from Night and Day Towing.

At approximately 11:30 a.m., defendant's secretary gave Hoekstra 217 vehicle titles. After comparing the titles to the vehicles in the J&J lot, Hoekstra found that only 18 of the titles matched the 101 vehicles in the lot. He asked defendant whether he had any documentation for the other vehicles. Defendant responded that he did not. The assignment portion of 173 of the 217 titles Hoekstra examined was not completed. In addition, the auditors observed that defendant's police book failed to indicate the disposition of 189 vehicles. That is, there were 290 entries in the book showing the acquisition but no disposition of a vehicle, yet there were only 101

vehicles in the J&J lot. In addition, defendant did not have a parts book to record the parts that he sold.

According to Hoekstra, if defendant scrapped or crushed a car, he was required to record this disposition in his police book. Hoekstra testified that defendant's police book indicated that a few of the vehicles he had acquired had been scrapped or crushed. Defendant did not, however, have documents, such as a uniform invoice or junk certificate, showing that he had disposed of the vehicles this way.

Based on the discovery of the stolen vehicles on the J&J lot, Hoekstra contacted the Illinois State Police. During the afternoon of January 25, 1996, Special Agent Lemming, Sergeant Jeffrey Blair, and other Illinois State Police officers arrived with a warrant to search defendant's business. Defendant told the officers that the Taurus had been in the J&J lot since December 1995, and the Escort had been in the lot for about six months. Like Hoekstra, Blair testified that the north and south boundaries of the J&J lot were each marked by a row of truck trailers. According to Blair, the boundaries were approximately 100 feet apart.

Lemming testified that, when he arrived at J&J, he spoke to Hoekstra, and Hoekstra gave him the police book and 199 of the titles he had received from defendant's secretary. Lemming and the other State Police officers searched the J&J office. They found defendant's 1996 license application, which had not been sent to the Secretary of State's office.

Lemming also spoke to defendant. When Lemming informed defendant that two stolen vehicles had been found in the J&J lot, defendant replied that a man named Jim from Night and Day Towing had towed both vehicles into the lot. Defendant called Jim from the office and handed the receiver to Lemming, but Lemming heard no one on the line. Lemming recalled seeing a card for Night

and Day Towing with a telephone number and the name Jim on it. Several days later Lemming attempted to get the telephone number for Night and Day Towing. The telephone company had no listing for this business, and Lemming was unsuccessful in his attempt to get the number from one of defendant's employees.

Lemming arrested defendant late in the day on January 25, 1996. Following the arrest, Lemming questioned defendant further. Defendant explained his auto recycling business to Lemming. He stated that he placed advertisements in the Chicago Sun-Times offering to buy junk vehicles from people. Defendant used his tow truck to tow these vehicles to the J&J lot. Defendant told Lemming that he had a partner named James Crumb but that defendant handled the day-to-day operations of the business, and defendant was the only J&J employee who purchased vehicles and received titles for J&J. According to Lemming, defendant also said that he sold auto parts from the J&J lot.

Defendant told Lemming that he had heard that the Escort and the Taurus were in his yard, but he had only seen the Escort. Defendant stated that he did not know these cars were stolen. Defendant said that he also knew that these cars were not in his police book, but this was because his secretary had probably forgotten to enter them into the book. With respect to the number of titles found in his office, defendant stated that, if he had a title without a vehicle, it meant that he had sent the vehicle to the "shredder."

According to Lemming, in order for title to a vehicle to be properly transferred, the seller must sign the back of his or her title, then the space for the buyer's name and address must be completed. Lemming testified that, with respect to nine of the vehicle titles recovered from defendant's office, there had been no assignment on the back of the titles to defendant or J&J. On the back of

three of these titles, the spaces for assignment had been completed, but the assignment was to an entity or individual other than J&J or defendant. The spaces for assignment on the back of the other six titles were blank. None of these nine vehicles were in the J&J lot. With respect to 16 of the other vehicle titles found in defendant's office, some of the sellers of the vehicles had signed the back of the titles, but the spaces for assignment to the buyer were incomplete. On the back of one of the 16 titles, J&J was listed as the buyer, but there was no address for J&J or date of assignment. On the remaining 15, neither J&J nor defendant was listed as a buyer. None of these 25 titles had been entered into defendant's police book.

Detective Paul Bernatek testified that in October 1988, he had a conversation with defendant during which he told defendant that, when defendant received the title for a vehicle, he was required to have the seller write his or her name and address on the title, after which defendant was to sign it, date it, and write the odometer reading on the title. He also told defendant that auto parts recyclers were required to maintain a book with records of their acquisitions of vehicles, including the identity of the seller, the date, the year, the make and the body style. Bernatek also informed defendant that, when a recycler disposed of a vehicle, he was required to list the date of disposition and the destination of the vehicle. In January 1989, Bernatek had another conversation with defendant, during which he again informed defendant of these record-keeping requirements for auto parts recyclers. Bernatek acknowledged that these conversations were not recorded in the reports he prepared.

Defendant and his employee, Jesse Dawkins, presented a completely different version of the events of January 25, 1996. In addition, their description of the dimensions of the J&J lot differed significantly from that of the State's witnesses.

According to Dawkins, when the auditors arrived at 9 a.m., Dawkins told them that only defendant's secretary was in the office, and defendant was not there. Defendant and Dawkins testified that defendant did not arrive at the J&J lot until 11 or 11:30 a.m. on January 25, 1996. At that time, Hoekstra told defendant that they were there to investigate his lot but did not ask for his police book. Hoekstra also did not ask defendant for any vehicle titles, and defendant did not give him any titles or records.

As the auditors performed their inventory, defendant and Dawkins saw them record the serial numbers of cars in the J&J lot, as well as in the two lots north of defendant's. These two lots were owned by James Crumb and Charles Dixon, who, like defendant, were in the auto wrecking business. Although defendant told Hoekstra that the vehicles on those lots were not his, Hoekstra told him that the vehicles would be considered his because he was the only one with a license.

Dawkins and defendant testified that the south boundary of the J&J lot was marked by truck trailers, but there were no trailers along the north boundary of the lot. According to defendant, the dimensions of the J&J lot were $51^1/_2$ feet by 887 feet. There was a private residence on the front half of the property. The property extended behind the office to the railroad tracks.

Defendant testified that he began operating J&J in January 1995. Prior to that time, the J&J lot was used as an auto wrecking yard by Dixon and Crumb. According to defendant, he and Crumb were partners, and the purpose of their partnership was to split rent. He acknowledged, however, that the 1995 license for J&J listed only defendant as the proprietor of J&J. Defendant and Dixon had a bad relationship and did not associate at all.

According to defendant, when he began operating

J&J, vehicle titles belonging to Dixon and Crumb remained in the office in a file cabinet. Defendant never looked in the file cabinet and, after January 1995, Crumb and Dixon continued to use the cabinet. Defendant and Crumb also shared the desk in the office and the police book. Defendant had two drawers in the desk, and Crumb had two drawers in the desk. Defendant stated that, when he purchased a vehicle, he would place the title for the vehicle on the desk in his office, and his secretary would enter it into the police book. Crumb was supposed to enter his own vehicles into the police book, and defendant knew that Crumb had been doing so with respect to some of the vehicles he purchased. Under their partnership arrangement, defendant was the only one who could purchase a car and accept a title on behalf of J&J. Likewise, Crumb bought vehicles on his own, and defendant had no control over the vehicles Crumb purchased. With respect to the vehicles listed in the police book, defendant said that some of them had been taken to a scrap processor and others were in the J&J lot. He did not know whether any of the vehicles that the police book indicated had been taken to a scrap processor were his vehicles.

Defendant and Dawkins testified that not all of the titles in the office belonged to defendant. Defendant did not know how many of his titles were in the office, but he had 50 or 60 in the desk drawer that belonged to him. As the police searched his office, defendant saw them removing items from the file cabinet. When he told the police that the cabinet was not his, the police responded that everything in the cabinet was considered his. He had never seen the 25 titles on which the possession of title without complete assignment charges was based. According to defendant, only the titles with his name on them belonged to him; the titles assigned to J&J were Crumb's.

Similarly, Dawkins and defendant testified that not all of the cars on the J&J lot belonged to defendant. Defendant stated that, at the time of the audit, he had only seven or eight cars and three trucks. The other vehicles on his lot belonged to Crumb, who had failed to move these cars to his own lot.

Defendant testified that he told Lemming that he did not know anything about the Escort and the Taurus, except that they had been towed into the area by Jim Stroud from Night and Day Towing. Dawkins testified that he had seen Jim tow cars into the J&J lot before, but did not see him tow the Escort and the Taurus. Defendant testified that Dawkins had told him that Jim had towed these cars to the J&J lot. Defendant also stated that Jim was planning to sell the Taurus to him.

Dawkins and defendant testified that, while the State Police were in the J&J office, defendant placed a call to Jim of Night and Day Towing and broadcast the call on the speaker telephone in the office. Jim identified himself on the telephone, and defendant asked him to bring the paperwork for the cars to J&J. When the police attempted to talk to Jim, he ended the call. According to defendant, he gave Lemming a card from Night and Day.

Dawkins testified that the Escort was a few feet on one side or the other of the property line between defendant's lot and the lot north of defendant's. Defendant testified that he told Lemming that the Escort was on Dixon's lot. At one point he testified that he did not know where the Taurus was because he never saw it. He later testified, however, that the Taurus was on his property.

Defendant did not remember whether Detective Bernatek informed him in 1989 about the necessity of completing the assignments on the back of titles or about the record-keeping requirements. Defendant denied that Bernatek told him that, as an auto parts recycler, he had

to keep records of the acquisition and disposition of vehicles.

In rebuttal, the State offered two certified copies of conviction. These documents showed that defendant had been convicted in March 1990 of possession of title with incomplete assignment. In addition, he was convicted in February 1990 of possession of a stolen motor vehicle and possession of a vehicle with its identification number removed.

At the conclusion of the presentation of this evidence, the circuit court found defendant not guilty of the charges of possession of a stolen motor vehicle. The court stated that there was conflicting testimony as to whether the Escort was on defendant's lot. With respect to possession of the Taurus, the court also found defendant not guilty because it found defendant's explanation that he did not see this car credible. The court also found defendant not guilty of the charges of failure to keep records related to these two vehicles. The circuit court found defendant guilty of the other charges of failure to keep records and possession of title with incomplete assignment. The circuit court sentenced defendant to three years' imprisonment based on the convictions for failure to keep records and one year of imprisonment for possession of titles with incomplete assignment, to run concurrently.

The appellate court reversed defendant's convictions. 302 Ill. App. 3d 128. In that court, defendant argued that (1) he was denied the effective assistance of counsel by his counsel's failure to file a motion to suppress; (2) the evidence was insufficient to establish his guilt beyond a reasonable doubt of failure to keep records; and (3) his convictions for possession of titles without complete assignment must be overturned because the circuit court failed to find that he acted with the mental state required for that offense. The appellate court rejected defendant's ineffective assistance of counsel argument. 302 Ill. App.

3d at 132-35. The court reversed defendant's convictions for failure to keep records and possession of title without complete assignment, however, because it agreed with defendant that the circuit court had failed to find that defendant possessed the mental state necessary for these offenses. 302 Ill. App. 3d at 135-40.

The appellate court noted that, in *People v. Tolliver*, 147 Ill. 2d 397 (1992), this court held that a finding of knowledge plus criminal intent is required for a defendant to be found guilty of possession of title without complete assignment under section 4—104(a)(2) of the Illinois Vehicle Code (625 ILCS 5/4—104(a)(2) (West 1996)). After reviewing the circuit court's comments at defendant's trial, the appellate court concluded that the circuit court had based its finding of guilt of this offense "simply on the possession of the open titles" and had made no finding that defendant had the requisite mental state. Accordingly, the appellate court decided that defendant's convictions for possession of title without complete assignment should be reversed. The appellate court chose not to remand the cause for a new trial, however. According to the appellate court, no evidentiary hearing was necessary because defense counsel had demonstrated an awareness of the *Tolliver* decision. The appellate court, therefore, remanded the cause for the circuit court to review the existing record in light of the *Tolliver* decision. 302 Ill. App. 3d at 137-38.

For the same reason, the appellate court reversed defendant's convictions for failure to keep records. It rejected defendant's argument that the circuit court's finding of guilt with respect to these offenses was inconsistent with its decision to acquit defendant on other charges. 302 Ill. App. 3d at 140. However, the appellate court determined that the circuit court had failed to find the existence of the mental state required for the offense of failure to keep records. Based on *Tolliver* and other

decisions discussing the mental state required for violations of other sections of the Vehicle Code, the appellate court concluded that knowledge with criminal purpose is an element of a violation of section 5—401.2 of the Vehicle Code. The appellate court held that, on remand, the circuit court should also reconsider its findings with respect to the charge of failure to keep records in light of *Tolliver*. 302 Ill. App. at 139-40.

## ANALYSIS

In the briefs defendant filed with this court, defendant argued only that the appellate court erred in ordering a limited nonevidentiary hearing rather than a new trial because of the circuit court's error in applying the mental state required for the offenses of possession of title without complete assignment and failure to keep records. In his petition for rehearing, defendant raises a new argument with respect to his convictions for failure to keep records. According to defendant's petition, section 5—401.2 violates due process because it permits individuals subject to its terms to be convicted of a felony absent culpable intent. We have decided to modify our original opinion in this case to address defendant's constitutional challenge.

We begin, however, with a discussion of the defendant's arguments concerning the charges of possession of title without complete assignment. Defendant argues that the appellate court erred in ordering a limited nonevidentiary hearing rather than a new trial after reversing his convictions. According to defendant, a new trial is required when a defendant is tried under an incorrect theory of law. He asserts that, by failing to require the State to prove that he acted with knowledge plus criminal purpose, the circuit court tried him under an incorrect theory of law. Defendant contends that the limited hearing ordered by the appellate court is unfair because it would require the circuit court to perform a new cred-

ibility assessment "on a cold record and distant memory" and because the circuit court's error may have affected the defense strategy.

The State has filed a request for cross-relief, in which it contends that the appellate court should have affirmed defendant's convictions because (1) the circuit court's comments indicate that it found defendant possessed the necessary mental state under section 4—104(a)(2) of the Vehicle Code, and (2) even if the circuit court failed to apply the correct mental state, the evidence established beyond a reasonable doubt that he violated this provision. In the alternative, the State argues that a limited hearing rather than a new trial was the appropriate relief for the circuit court's application of an incorrect mental state at defendant's trial.

Before considering the issues raised by defendant's appeal, it is necessary to address the State's argument that defendant's convictions should be affirmed, regardless of any erroneous application of the necessary mental state by the circuit court. If the appellate court erred in reversing defendant's convictions, we need not decide the propriety of its decision to remand his case for a limited nonevidentiary hearing.

The State argues that, even if the circuit court erred by failing to find the existence of the mental state required to establish a violation of section 4—104(a)(2), we should affirm defendant's convictions because the evidence established his guilt beyond a reasonable doubt, and a reviewing court may affirm a circuit court on any basis in the record, even if the circuit court did not rely on those grounds. See *People v. Caballero*, 179 Ill. 2d 205, 211 (1997). Defendant replies that we cannot affirm his convictions because there was insufficient evidence at trial of the mental state required under section 4—104(a)(2).

Whether the evidence was sufficient to convict defen-

dant of violating section 4—104(a)(2) depends on the elements of the offense under that provision. Section 4—104 states in pertinent part:

"(a) It is a violation of this Chapter for:

\*\*\*

2. A person to possess any manufacturers certificate of origin, salvage certificate, junking certificate, certificate of title, display certificate without complete assignment[.]

\* \* \*

(b) Sentence:

1. A person convicted of a violation of subsection 1 or 2 of paragraph (a) of this Section is guilty of a Class 4 felony." 625 ILCS 5/4—104 (West 1996).

Although the statutory provision describing the offense of possession of title without complete assignment contains no mental state, this court has supplied a mental state in previous cases involving this statute. In *People v. Gean*, 143 Ill. 2d 281 (1991), this court held that the mental state of knowledge is an element of offenses under section 4—104. In *Gean*, the defendant had argued that section 4—104 violated due process protections because it created a felony offense with no mental state. This court rejected the defendant's constitutional challenge. The court explained that, under section 4—9 of the Criminal Code of 1961, a mental state requirement should be implied unless it is clear that the legislature intended an absolute liability offense. *Gean*, 143 Ill. 2d at 285-86. This court supplied a mental state for violations of sections 4—104(a)(1) and 4—104(a)(2) because there was no indication that the legislature intended absolute liability under these provisions. The court found that "knowledge" was the appropriate mental state. Thus, this court held that, to prove a violation of section 4—104(a)(2), the State was required to show that a defendant possessed a certificate of title "knowing that he did not have authority or knowing it was without complete assignment." *Gean*, 143 Ill. 2d at 287-89.

In *People v. Tolliver*, 147 Ill. 2d 397 (1992), this court modified the holding in *Gean* with respect to the mental state requirement under section 4—104(a)(2) of the Vehicle Code. The defendant in *Tolliver* had filed a motion to dismiss the charge against him on the basis that section 4—104(a)(2) is unconstitutional. The circuit court denied his motion and found him guilty of violating this provision. The appellate court reversed after concluding that section 4—104(a)(2) was unconstitutional because it required no mental state and would punish innocent behavior. *Tolliver*, 147 Ill. 2d at 399.

This court upheld the constitutionality of section 4—104(a)(2). The *Tolliver* court observed that, under *Gean*, the State was required to prove knowledge as an element of a violation of section 4—104(a)(2). It found, however, that, under *Gean*, section 4—104(a)(2) could be used to punish innocent behavior. For example, if a husband and wife jointly owned a car, the wife signed the title as a seller, and the husband took the title to the buyer or dealer, the husband would be considered to have knowingly possessed an incomplete title. *Tolliver*, 147 Ill. 2d at 400-02. According to the *Tolliver* court, under this and other scenarios, offenders could be found guilty of a felony even though they lacked any criminal intent. The court stated, "[s]uch innocent but knowing conduct, which is wholly devoid of criminal or devious intent, should not render a person guilty of a felony." *Tolliver*, 147 Ill. 2d at 402. Therefore, the *Tolliver* court decided that the *Gean* holding should be expanded such that, to establish a violation of section 4—104(a)(2), the State must prove "criminal knowledge or knowledge with an intent to defraud or commit a crime." *Tolliver*, 147 Ill. 2d at 400-01. This court also described the mental state requirement under section 4—104(a)(2) as "knowledge plus criminal purpose." *Tolliver*, 147 Ill. 2d at 403. With this modification, the *Tolliver* court found section

4—104(a)(2) constitutional. *Tolliver*, 147 Ill. 2d at 403. See also *People v. Johns*, 153 Ill. 2d 436, 446 (1992) (reiterating the *Tolliver* holding that the required mental state for section 4—104(a)(2) is criminal knowledge or criminal purpose); but see *Tolliver*, 147 Ill. 2d at 403-06 (Freeman, J., concurring, joined by Miller, C.J.) (finding the majority's modification of the knowledge requirement unnecessary).

An examination of the evidence presented at trial, in light of the necessary elements of an offense under section 4—104(a)(2), leads us to the conclusion that there was insufficient evidence presented at trial to find defendant guilty of possession of title with incomplete assignment.

In reviewing the sufficiency of the evidence to support a conviction, the proper inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Howery*, 178 Ill. 2d 1, 38 (1997), quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979). After carefully considering the evidence presented at defendant's trial in the light most favorable to the State, we cannot conclude that a rational trier of fact could have found that there was a criminal purpose associated with defendant's possession of title without complete assignment.

Our conclusion is supported by *Tolliver*. In *Tolliver*, this court reversed the defendant's conviction under section 4—104(a)(2) after finding no evidence of criminal purpose. Like the defendant in the case before us, the *Tolliver* defendant was charged under section 4—104(a)(2) with possession of title without complete assignment. The charge resulted from defendant's sale of a vehicle to Thomas Murphy. Murphy noticed that the title

to the vehicle that he had received from defendant was signed by an individual named David Hayes rather than defendant. When Murphy asked defendant to sign the title, defendant told him to just sign it himself. Murphy contacted the Secretary of State's office, and defendant was subsequently charged with possession of title without complete assignment. *Tolliver*, 147 Ill. 2d at 399.

The circuit court found defendant guilty of violating section 4—104(a)(2) because, in the court's view, "there was no valid lawful reason for not completing the title and the only reason an individual would not complete it was to avoid sales tax." *Tolliver*, 147 Ill. 2d at 399. This court reversed the *Tolliver* defendant's conviction, however, because we concluded that there was no evidence that the defendant had a criminal purpose and no allegations that he had stolen a car or attempted to perpetrate a fraud. *Tolliver*, 147 Ill. 2d at 403.

Likewise, in this case, there was no evidence that defendant possessed title without complete assignment for a criminal purpose. As in *Tolliver*, no facts were presented that demonstrated that defendant stole any of the vehicles for which he possessed an incomplete title, or that he was using these titles to perpetrate a fraud. In fact, defendant was acquitted of the charges that he possessed stolen vehicles.

The State fails to identify any other type of criminal activity that might have motivated defendant's possession of incomplete titles. The State merely asserts that some general criminal purpose may be inferred from the evidence presented at trial. In support of this argument, the State observes that the circuit court did not give credence to defendant's argument that some of the titles and vehicles examined by the auditors were owned by Crumb. The rejection of this defense, however, does not suffice as proof of criminal purpose. The State also argues that a criminal purpose may be inferred from defendant's

experience as an auto parts recycler and his awareness of the requirements of section 4—104(a)(2). While these facts indicate that defendant's possession of title without complete assignment was knowing, they do not show that defendant acted with a criminal purpose. For similar reasons, we disagree with the State's assertion that the number of titles defendant possessed without complete assignment and the number of titles he possessed without cars on his lot is circumstantial evidence of a criminal purpose. While the number of irregularities in defendant's record keeping may prove his knowledge of a violation, it does not prove the reason for the violation. To conclude that these violations were the result of a criminal scheme rather than poor or disorganized record keeping by defendant would be pure speculation. Given the insufficient evidence of a criminal purpose behind defendant's possession of title without complete assignment, we hold, as we did in *Tolliver*, that defendant's convictions under section 4—104(a)(2) must be reversed. See also *People v. DePalma*, 256 Ill. App. 3d 206, 214 (1994) (finding insufficient evidence of criminal purpose); *People v. Jones*, 227 Ill. App. 3d 917, 919-20 (1992) (same).

We now turn to defendant's challenge to the constitutionality of his convictions for failure to keep records under section 5—401.2 of the Vehicle Code. Section 5—401.2 requires certain individuals licensed under the Vehicle Code to maintain records relating to the acquisition and disposition of vehicle and parts for three years at their place of business. 625 ILCS 5/5—401.2(a) (West 1996). Section 5—401.2 further provides that "[a]ny person who knowingly fails to keep the records required by this Section or who knowingly violates this Section shall be guilty of a Class 2 felony" (625 ILCS 5/5—401.2(i) (West 1996)).

Despite the language in section 5—401.2 describing

knowledge as the mental state for the offense of failure to keep records, the appellate court held, *sua sponte*, that the mental state prescribed in *Tolliver* for violations of section 4—104(a)(2) also applies to the offense of failure to keep records under section 5—401.2. Based on the circuit court's comments at the conclusion of defendant's trial, the appellate court found that the circuit court had failed to find the existence of this mental state. It, therefore, reversed defendant's convictions under section 5—401.2 and remanded the cause for the circuit court to apply the proper mental state in assessing the evidence that had been presented at defendant's trial.

In the opinion originally filed by this court in this case, we affirmed defendant's convictions under section 5—401.2. We held that, according to the express terms of section 5—401.2, the mental state required for a violation of this provision is knowledge. We found that the circuit court applied the proper mental state, and the evidence supported its decision that defendant was guilty of failure to keep records.

In his petition for rehearing, however, defendant argues for the first time that section 5—401.2 is unconstitutional on its face and as applied to him. Defendant contends that section 5—401.2 violates due process because it permits a conviction of failure to keep records to be based on mere knowledge, thereby potentially punishing innocent behavior. In addition, he asserts that imposing a felony penalty for such behavior is not a reasonable means of accomplishing the purpose of section 5—401.2. Further, defendant argues that application of section 5—401.2 to him violates due process because the evidence demonstrates no criminal purpose associated with his failure to keep records. Instead, defendant testified that he did not know how to keep the required records and relied on his secretary to do so.

We ordered the State to answer defendant's petition

(see 155 Ill. 2d R. 367(d)) and directed it to respond to defendant's arguments that (1) we should address his constitutional challenge despite his failure to raise it prior to filing his petition for rehearing, and (2) section 5—401.2 is unconstitutional on its face and as applied to defendant. The State did not discuss waiver in its answer. With respect to defendant's constitutional challenge, the State argues that section 5—401.2 does not violate due process. According to the State, the legislature could have reasonably determined that failure to keep the records required by section 5—401.2 was so important to control auto-related offenses that a felony penalty was necessary to punish vehicle dealers and recyclers, even those without a criminal purpose. After reviewing defendant's petition and the State's answer, we have decided to modify the opinion filed in this case. We now reverse defendant's convictions for failure to keep records because we find that section 5—401.2 is invalid on due process grounds.

Generally, parties may not argue new points in a petition for rehearing. See 177 Ill. 2d R. 341(e)(7); 155 Ill. 2d R. 367(b); *Dow v. Columbus-Cabrini Medical Center*, 274 Ill. App. 3d 653, 659 (1995). Nevertheless, we find it appropriate in this case to address the merits of defendant's due process challenge to section 5—401.2 despite his failure to raise it until filing his petition for rehearing in this court. In its answer to defendant's petition for rehearing, the State did not argue that defendant is precluded from making a constitutional challenge to section 5—401.2 because of his failure to raise this issue previously. In addition, this court has held that a challenge to the constitutionality of a criminal statute may be raised at any time. See, *e.g.*, *People v. Wooters*, 188 Ill. 2d 500, 510 (1999) (considering constitutionality of statute raised for the first time in appellate briefs); *People v. Bryant*, 128 Ill. 2d 448, 454 (1989) (same); *People v.*

*Sarelli*, 55 Ill. 2d 169, 171 (1973) (considering constitutionality of statute raised for the first time in a postconviction petition). Indeed, if, as defendant argues, section 5—401.2 is unconstitutional, it would be fundamentally unfair to uphold his convictions. See *People v. Zeisler*, 125 Ill. 2d 42, 46 (1988) (if a statute creating an offense is unconstitutional, it is considered void *ab initio*).

Our review of the merits of defendant's constitutional challenge is guided by the following familiar principles. Statutes are presumed constitutional, and a party challenging the constitutionality of a statute has the burden of establishing its invalidity. *People v. Lantz*, 186 Ill. 2d 243, 254 (1999). Pursuant to its police power, the legislature has wide discretion to establish penalties for criminal offenses, but this discretion is limited by the constitutional guarantee that a person may not be deprived of liberty without due process of law. *In re K.C.*, 186 Ill. 2d 542, 550 (1999). When legislation does not affect a fundamental constitutional right, the test for determining whether it complies with substantive due process requirements is the rational basis test. *People v. Hamm*, 149 Ill. 2d 201, 216 (1992). Under this test, a statute will be upheld if it "bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective." *People v. Adams*, 144 Ill. 2d 381, 390 (1991).

The legislature's purpose in enacting section 5—401.2 can be found in section 5—100—1 of the Vehicle Code. In this provision, the legislature expressed its findings, *inter alia*, that "essential to the criminal enterprise of vehicle theft operations is the ability of thieves to transfer or sell stolen vehicles or their parts through legitimate commercial channels, making them available for sale to the automotive industry" and "vehicle dealers, scrap processors, automotive parts recyclers, repairers and rebuilders

who comprise the vast majority of the persons engaged in the automotive business in this State are frequently exposed to pressures and influences from motor vehicle thieves." 625 ILCS 5/5—100—1 (West 1996). In addition, section 5—100—1 contains a statement that, in enacting section 5—401.2 and related provisions, the legislature intended "to establish a system of mandatory licensing and record keeping which will prevent or reduce the transfer or sale of stolen vehicles or their parts within this State." 625 ILCS 5/5—100—1 (West 1996).

To achieve this purpose, section 5—401.2(a) requires certain individuals licensed under the Vehicle Code to keep records, including the year, make, and model of a part or vehicle; the style and color of a vehicle; the date of acquisition of a part or vehicle; the name and address of the person from whom the part or vehicle was acquired; the date of disposition of the part or vehicle; the name and address of the person with whom the part or vehicle was disposed; and the number of the uniform invoice reflecting the disposition of the part or vehicle, if applicable. 625 ILCS 5/5—401.2(a) (West 1996). The failure to record any of this specific information constitutes a failure to keep records. 625 ILCS 5/5—401.2(b) (West 1996).

We agree with defendant that section 5—401.2 cannot withstand scrutiny under the rational basis test. In analogous cases, this court and courts in other jurisdictions have held that criminal statutes that potentially punish innocent conduct violate due process principles because they are not reasonably designed to achieve their purposes. In *People v. Wick*, 107 Ill. 2d 62 (1985), for example, this court held that the aggravated arson statute was not rationally related to its purpose because it could be applied to innocent activities. Under that statute, a person could be convicted of aggravated arson, a Class X felony, for knowingly damaging a building if a

fireman or policeman on the scene was injured. Unlike the arson statute, the aggravated arson statute did not require that the damaged property belong to another or that the damage occur with the intent to defraud an insurer. This court found that, because the aggravated arson statute did not require proof of an unlawful purpose, it could potentially punish innocent conduct. For example, if a policeman or fireman were injured as a result of a farmer setting fire to his own deteriorated barn, the farmer would be subject to a Class X felony conviction under the aggravated arson statute. *Wick*, 107 Ill. 2d at 66.

This court concluded that, if the purpose of the aggravated arson statute was to impose a severe punishment for arsonists whose acts injured a policeman or fireman, it was not reasonably related to its purpose because it was not limited to arsonists. In addition, imposing a Class X penalty for individuals with no culpable intent is not a reasonable means of punishing arsonists who injure firemen or policemen. Similarly, if the purpose of the statute was to discourage laymen from setting fire to structures, "imposing a Class X penalty in case of injury but no penalty otherwise would not be a reasonable method of ensuring compliance with such a ban." *Wick*, 107 Ill. 2d at 67. Thus, this court held that the aggravated arson statute violated due process.

Similarly, in *People v. Zaremba*, 158 Ill. 2d 36 (1994), this court held that a portion of the theft statute failed the rational basis test because it could be used to punish innocent conduct. The statute made it a crime for an individual to knowingly exert control over property " 'in the custody of any law enforcement agency which is explicitly represented to him by any law enforcement officer or any individual acting in behalf of a law enforcement agency as being stolen.' " (Emphasis omitted.) *Zaremba*, 158 Ill. 2d at 39-40, quoting Ill. Rev. Stat. 1989,

ch. 38, par. 16—1(a)(5). If the property involved was valued at more than $300, a violation of this statute was a felony offense.

This court found that section 16—1(a)(1) was not reasonably related to its purpose, which was to enable police officers to break up fencing enterprises through undercover operations. This court explained that, because section 16—1(a)(1) contained no culpable mental state, it could potentially subject innocent conduct, such as an evidence technician's legitimate custody of stolen property, to a felony penalty. Accordingly, this court held that the statute violated due process principles. *Zaremba*, 158 Ill. 2d at 42-43.

In *State v. Saiez*, 489 So. 2d 1125 (Fla. 1986), the Florida Supreme Court held that a statute making it a crime to knowingly possess a credit card embossing machine violated due process because it could potentially punish innocent activities. In support of its decision, the court reasoned:

> " 'In order to meet constitutional limitations on police regulation, this prohibition, i.e. against possession of objects having a common and widespread lawful use, must under our previous decisions be reasonably "required as incidental to the accomplishment of the primary purpose of the Act." There is little doubt that the penalty against possession of such equipment will simplify the problem of enforcing the primary prohibition ***. Expediency, however, is not the test, and we conclude that convenience of enforcement does not warrant the broad restriction imposed by [the statute].' " *Saiez*, 489 So. 2d at 1128, quoting *Delmonico v. State*, 155 So. 2d 368, 369-70 (Fla. 1963).

According to the *Saiez* court, the statute at issue was not reasonably related to its purpose of preventing credit card fraud because it interfered with the rights of individuals who used the machines for noncriminal activities. The *Saiez* court concluded that the broad scope of the statute was not necessary and held it invalid on due process grounds. *Saiez*, 489 So. 2d at 1129; see also

*Akron v. Rasdan,* 105 Ohio App. 3d 164, 663 N.E.2d 947 (1995) (statute prohibiting possession of knife more than 2¹/₂ inches long was not reasonably related to its purpose because it criminalized inherently innocent, harmless, and useful conduct); W. LaFave & A. Scott, Substantive Criminal Law § 2.12, at 211-15 (1986) (observing that, unlike the United States Supreme Court, state courts will invalidate statutes on due process grounds if the legislature could have provided an equally effective but less severe means of addressing a particular evil).

We find that section 5—401.2 is not reasonably designed to achieve its purpose. Under section 5—401.2, even a slight lapse in record keeping by an individual with no criminal purpose may be punished as a Class 2 felony. For example, an individual who knowingly fails to record the color of a single vehicle could be convicted of failure to keep records, even if that failure were caused by a disability, family crisis, or incompetence. Because section 5—401.2 potentially subjects such innocent conduct to such a severe penalty, we find that it does not contain a reasonable means of preventing the trafficking of stolen vehicles and parts. See *Zaremba,* 158 Ill. 2d at 42-43; *Hamm,* 149 Ill. 2d at 218 (holding that imposing "a Class 3 felony for a person otherwise legally commercially fishing and taking over $300 worth of fish, but who fails to have a tag on his net as proof that the net is licensed, or fails to have in his immediate possession his fishing license to prove he is licensed, is not reasonably designed to protect the citizens of Illinois from depleting our natural resources"); *Wick,* 107 Ill. 2d at 66-67; *cf. Tolliver,* 147 Ill. 2d at 402. Accordingly, we hold that section 5—401.2 violates due process protections.

To avoid this constitutional problem, defendant asserts that we should read the mental state of knowledge plus criminal purpose into section 5—401.2, as we did in *Tolliver* for section 4—104(a)(2). According to defendant,

if knowledge plus criminal purpose is the applicable mental state under section 5—401.2, his convictions for failure to keep records must be reversed because the evidence is insufficient to establish that he acted with a criminal purpose. The State responds that we may not read the *Tolliver* mental state into section 5—401.2 because, unlike section 4—104(a), the failure-to-keep-records provision unambiguously provides that the applicable mental state is knowledge.

As the State observes, we may not read a mental state of knowledge plus criminal purpose into section 5—401.2. In *Tolliver*, we were able to imply the mental state of knowledge plus criminal purpose as an element of section 4—104(a)(2) because that provision contained no mental state. After determining that the legislature did not intend to create an absolute liability offense, therefore, this court was free to choose an appropriate mental state and to imply this mental state as an element of the statute. See 720 ILCS 5/4—9 (West 1996); *People v. Anderson*, 148 Ill. 2d 15, 23-24 (1992).

Unlike section 4—104, section 5—401.2 does not lack a mental state element. Section 5—401.2(i) expressly provides that the mental state for the offense of failure to keep records is knowledge. When a statute is unambiguous, it must be enforced as enacted, and a court may not depart from its plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature. *People v. Woodard*, 175 Ill. 2d 435, 443 (1997). The responsibility for the wisdom or justice of legislation rests with the legislature, and courts may not rewrite statutes to make them consistent with the court's idea of orderliness and public policy. *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 220 (1983). Consistent with these principles, in *Zaremba*, *Wick*, and *Hamm*, we did not read the mental state of knowledge plus criminal purpose into the

statutes at issue because they expressly provided knowledge as the mental state. Instead, we held that these statutes were invalid. We must do the same in this case.

We hold that defendant has met his burden of establishing that section 5—401.2 is unconstitutional and reverse his convictions for failure to keep records. Because providing an effective system of mandatory record keeping to prevent or reduce the transfer or sale of stolen vehicles and parts is a laudatory goal, we encourage the legislature to remedy this constitutional defect at the earliest possible time.

Because we hold that section 5—401.2 is facially invalid on due process grounds, we need not address defendant's claim that this statute is unconstitutional as applied to him. In addition, we need not address the parties' arguments regarding the propriety of the appellate court's decision to remand the cause for a limited nonevidentiary hearing. No remand is necessary for the circuit court to reevaluate the evidence of defendant's possession of title without complete assignment in light of *Tolliver* because, as stated, the evidence is insufficient to permit a conclusion that defendant acted with the *Tolliver* mental state. Our holding that defendant's convictions under section 5—401.2 must be reversed because this statute is unconstitutional also obviates the need for a remand. Accordingly, we need not decide whether the appellate court should have ordered a new trial rather than a limited hearing.

## CONCLUSION

For these reasons, we reverse the judgment of the appellate court remanding this cause for a limited evidentiary hearing. We reverse defendant's convictions for possession of title without complete assignment under section 4—104(a)(2) of the Vehicle Code and failure to

keep records under section 5—401.2(a). Defendant's sentences are vacated.

*Judgments reversed.*

JUSTICE FREEMAN, specially concurring:

I agree with the majority's disposition of this case. I write separately merely to note that defendant's prior convictions could have been offered as substantive evidence of his intent on the charges of possession of title without complete assignment. See *People v. Oaks*, 169 Ill. 2d 409, 454 (1996) ("[e]vidence of other crimes is admissible if it tends to prove *modus operandi*, design, motive or knowledge"). However, the record reveals that at trial the State offered defendant's prior convictions only for impeachment purposes, not as direct evidence of guilt. Accordingly, in this case defendant's prior convictions cannot be considered as direct evidence of intent. See *People v. Hope*, 184 Ill. 2d 39, 44 (1998) (arguments not raised by State at trial may not be raised on appeal); *People v. Adams*, 131 Ill. 2d 387, 395 (1989) (refusing to allow State, as appellee, to argue a theory on appeal for admissibility of evidence which was not raised in trial court). It is thus unnecessary to speculate whether the prior convictions could have constituted sufficient evidence of intent to uphold defendant's convictions for possession of title without complete assignment in the instant case.

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority that the defendant's convictions for the offense of possession of title without complete assignment, in violation of section 4—104(a)(2) of the Illinois Vehicle Code (625 ILCS 5/4—104(a)(2) (West 1996)), cannot stand. I do not agree, however, with the majority's further conclusion, in response to the defendant's petition for rehearing, that the defendant's

convictions for failure to keep records, in violation of section 5—401.2(a) of the Vehicle Code (625 ILCS 5/5—401.2(a) (West 1996)), must also be reversed. The defendant now argues, and the majority now agrees, that the statute defining that offense might punish innocent conduct and is therefore unconstitutional. I believe that section 5—401.2(a) is valid; accordingly, I dissent from that portion of the majority opinion, as modified on denial of rehearing, and I would instead adhere to the conclusion found in our original opinion in this case, filed February 17, 2000, that the trial judge properly found the defendant guilty of those charges.

The record-keeping requirements of section 5—401.2 are part of a group of statutes found in chapter V of the Vehicle Code that regulate licensed automobile dealers, transporters, wreckers, and rebuilders. As a dealer in used auto parts, the defendant was licensed under article III of that chapter, which is applicable to automotive parts recyclers, scrap processors, repairers, and rebuilders. Pursuant to section 5—401.2, the defendant was required to maintain extensive and detailed records regarding the acquisition and disposition of automobiles and automobile parts in the course of his business. In addition, the defendant's operations were subject to periodic inspections by the Secretary of State, whose office is authorized to ensure compliance with the record-keeping requirements of the Vehicle Code. 625 ILCS 5/5—403 (West 1996).

As the majority recognizes, the legislative purposes for this statutory scheme are expressed in section 5—100—1 of the Vehicle Code. 625 ILCS 5/5—100—1 (West 1996). After stating a number of findings by the legislature regarding the problems of motor vehicle theft and the business of motor vehicle sales and repairs, section 5—100—1 concludes, "It is, therefore, the intent of the General Assembly to establish a system of manda-

tory licensing and record keeping which will prevent or reduce the transfer or sale of stolen vehicles or their parts within this State.''

It is readily apparent that the records that scrap yard operators and licensees like the defendant are required to keep under section 5—401.2 represent an integral part of this statutory scheme. The defendant, as a licensee under the Vehicle Code, is a participant in a highly regulated industry, and the legislature has reasonably determined that extensive record keeping is a responsibility of licensees under the Code. Despite the legislature's clear findings and statement of intent, the majority concludes that the offense found in section 5—401.2 does not bear a rational relationship to the evil it is designed to address. Specifically, the majority concludes that the statute might punish what, in the majority's view, is wholly innocent conduct. I disagree.

The record-keeping requirements of section 5—401.2 apply only to persons licensed under the provisions of chapter V of the Vehicle Code. I believe that the legislature may define offenses in this manner and impose on persons who engage in certain trades and occupations the duty to compile and maintain records of their business. The pertinent constitutional question in these circumstances is not whether there might be an innocent explanation for a licensee's knowing failure to keep certain records, as the majority suggests, but whether the record-keeping requirements imposed by the legislature are rationally related to the evils the legislation is designed to remedy. The second question must be answered in the affirmative, in light of the obvious relationship between the record-keeping requirements of section 5—401.2 and the legislature's goal of reducing the traffic in stolen automobiles and automobile parts.

Given the state's significant interest in regulating the business of automobile recyclers and parts dealers,

and the corresponding necessity for extensive record keeping by licensed operators, I believe that the present case is much different from the cases cited by the majority, in which challenged offenses might irrationally criminalize conduct legitimately performed without a criminal purpose (see *People v. Zaremba*, 158 Ill. 2d 36 (1994); *People v. Wick*, 107 Ill. 2d 62 (1985); see also *State v. Saiez*, 489 So. 2d 1125 (Fla. 1986) (possession of credit card embossing machine); *Akron v. Rasdan*, 105 Ohio App. 3d 164, 663 N.E.2d 947 (1995) (possession of knife more than 2½ inches long)), or in which the penalty for a challenged offense is not rationally related to the goals of the underlying legislation (*People v. Hamm*, 149 Ill. 2d 201 (1992)).

The present appeal does not involve circumstances remotely similar to those cases. The defendant is licensed under chapter V of the Vehicle Code, and pursuant to section 5—401.2 he is required to keep certain records regarding his business. The duty imposed on the defendant as a licensee under the Code is rationally related to the goals of the legislation, and I would therefore conclude that section 5—401.2 is constitutional.

CHIEF JUSTICE HARRISON joins in this partial concurrence and partial dissent.

JUSTICE BILANDIC, also concurring in part and dissenting in part:

I agree with the majority that defendant's convictions for possession of title without complete assignment under section 4—104(a)(2) of the Vehicle Code (625 ILCS 5/4—104(a)(2) (West 1996)) must be reversed. However, I agree with Justice Miller's partial dissent that defendant's convictions for failure to keep records under sections 5—401.2(a) and (i) of the Vehicle Code (625 ILCS 5/5—401.2(a), (i) (West 1996)) should be affirmed. I write

separately to express my rationale for finding section 5—401.2 constitutional.

The legislature is empowered to declare and define conduct constituting a crime, and to determine the nature and extent of the punishment. *People v. Steppan*, 105 Ill. 2d 310, 319 (1985). To satisfy due process, a criminal statute must be reasonably designed to remedy the evils that the legislature has determined constitute a threat to the public health, safety and general welfare. *In re K.C.*, 186 Ill. 2d 542, 550-51 (1999). Chapter V of the Vehicle Code (625 ILCS 5/5—100 *et seq.* (West 1996)), which regulates automotive dealers, transporters, wreckers and rebuilders, and under which defendant is licensed, sets forth in considerable detail the findings and purpose underlying its mandatory licensing and record-keeping provisions:

"The General Assembly finds that: (1) crimes involving the theft of vehicles and their parts have risen steadily over the past years, with a resulting loss of millions of dollars to the residents of this State; (2) essential to the criminal enterprise of vehicle theft operations is the ability of thieves to transfer or sell stolen vehicles or their parts through legitimate commercial channels, making them available for sale to the automotive industry; (3) vehicle dealers, scrap processors, automotive parts recyclers, repairers and rebuilders who comprise the vast majority of the persons engaged in the automotive business in this State are frequently exposed to pressures and influences from motor vehicle thieves; (4) elements of organized crime are constantly attempting to influence businessmen engaged in the sale and repair of motor vehicles so as to further their own criminal interests; and (5) close and strict government regulation of vehicle dealers, scrap processors, automotive parts recyclers, repairers and rebuilders will provide a system of tracking the flow of vehicles and their essential parts and therefore significantly reduce the numbers of vehicle-related thefts in this State. It is, therefore, the intent of the General Assembly to establish a system of mandatory licensing and record keep-

ing which will prevent or reduce the transfer or sale of stolen vehicles or their parts within this State." 625 ILCS 5/5—100—1 (West 1996).

The record-keeping requirements of section 5—401.2(a) are inextricably linked and rationally related to the evils sought to be remedied by the statute, *i.e.*, "the transfer or sale of stolen vehicles or their parts." The failure to maintain the required records facilitates the easy disposal of stolen vehicles, thereby thwarting the clear purpose of the statute. Consistent with this purpose, the record-keeping and penalty provisions of section 5—401.2 are expressly applicable only to certain persons required to be licensed under chapter V: new and used vehicle dealers (625 ILCS 5/5—101, 5—102 (West 1996)); automotive parts recyclers (like defendant), repairers and rebuilders (625 ILCS 5/5—301 (West 1996)); and out-of-state salvage vehicle buyers (625 ILCS 5/5—302 (West 1996)). 625 ILCS 5—401.2(a), (i) (West 1996).

Significantly, the application for a license as an automotive parts dealer must include a statement that the applicant understands chapters I through V of the Vehicle Code. See 625 ILCS 5/5—301(b)(7) (West 1996). The applicant must also supply detailed information on the ownership of the business. 625 ILCS 5/5—301(b)(3) (West 1996). The applicant must aver under oath that the principals in the business have not committed in the past three years any one violation of any one of the following acts: the anti-theft laws of the Vehicle Code (625 ILCS 5/4—101 *et seq.* (West 1998)); the "Certificates of Title" laws of the Vehicle Code (625 ILCS 5/3—100 *et seq.* (West 1998)); the "Offenses Against Registration and Certificates of Title Laws" of the Vehicle Code (625 ILCS 5/3—701 *et seq.* (West 1998)); the "Dealers, Transporters, Wreckers and Rebuilders" laws of the Vehicle Code (625 ILCS 5/5—100 *et seq.* (West 1998)); section 21—2 of the Criminal Code of 1961, entitled "Crim-

inal trespass to vehicles" (720 ILCS 5/21—2 (West 1998));
or the Retailers' Occupation Tax Act (35 ILCS 120/1 *et
seq.* (West 1998)). 625 ILCS 5/5—301(b)(4) (West 1996).
The applicant must further aver under oath that the
principals in the business have not committed in any
calendar year three or more violations of any one or more
of the following acts: the Consumer Finance Act (Ill. Rev.
Stat. 1983, ch. 17, par. 5601 *et seq.*, repealed by Pub. Act
84—1004, § 9, eff. November 1, 1985); the Consumer
Installment Loan Act (205 ILCS 670/1 *et seq.* (West
1998)); the Retail Installment Sales Act (815 ILCS 405/1
*et seq.* (West 1998)); the Motor Vehicle Retail Installment
Sales Act (815 ILCS 375/1 *et seq.* (West 1998)); the Inter-
est Act (815 ILCS 205/0.01 *et seq.* (West 1998)); the Il-
linois Wage Assignment Act (740 ILCS 170/.01 *et seq.*
(West 1998)); part 8 of article XII of the Code of Civil
Procedure, entitled "Wage Deductions" (735 ILCS 5/12—
801 *et seq.* (West 1998)); or the Consumer Fraud and
Deceptive Business Practices Act (815 ILCS 505/1 *et seq.*
(West 1998)). 625 ILCS 5/5—301(b)(5) (West 1996).
Finally, as part of the application process, the applicant
"authorizes an investigation to determine if the applicant
has ever been convicted of a crime and if so, the disposi-
tion of those convictions." 625 ILCS 5/5—105 (West
1996).

The statutory scheme set forth above provides
licensees with notice that the industry into which they
are entering is subject to close scrutiny and regulation.
This is not a recent and unexpected development in the
law. The automobile and automotive parts industry in Il-
linois has long been the subject of extensive regulation.
See *People v. Krull*, 126 Ill. 2d 235, 246 (1989), citing
*Bionic Auto Parts & Sales, Inc. v. Fahner*, 721 F.2d 1072,
1079 (7th Cir. 1983). Since 1934, the state has required
licensure of automotive parts dealers (see *Krull*, 126 Ill.
2d at 246), and, since 1956, has imposed record-keeping

requirements (see *Bionic Auto Parts & Sales, Inc.*, 721 F.2d at 1079). In 1985, the legislature adopted measures to provide criminal sanctions for the failure to maintain adequate records. See *Krull*, 126 Ill. 2d at 246.

The legislature's extensive findings and stated purpose in enacting chapter V of the Vehicle Code, and the obvious and intrinsic link between the record-keeping requirements and the statute's purpose, along with the industry's long history of regulation, compel a finding that section 5—401.2 is constitutional. The majority, however, concludes that the knowing failure to keep the required records may constitute innocent conduct, and that section 5—401.2 thus suffers from the same defect as the statutes at issue in *People v. Zaremba*, 158 Ill. 2d 36 (1994), and *People v. Wick*, 107 Ill. 2d 62 (1985). I disagree because the circumstances in *Zaremba* and *Wick* are distinguishable from this case.

In *Zaremba*, we held that the following provision of the theft statute offends due process:

"A person commits theft when he knowingly:

\* \* \*

(5) Obtains or exerts control over property in the custody of any law enforcement agency which is explicitly represented to him by any law enforcement officer or any individual acting in behalf of a law enforcement agency as being stolen." Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(5).

A violation of section 16—1(a)(5) involving property valued in excess of $300 was a felony offense. See Ill. Rev. Stat. 1989, ch. 38, par. 16—1(b)(4).

Unlike other provisions of the theft statute, section 16—1(a)(5) required neither that the control over the property was unauthorized, nor that there was an intent to permanently deprive the rightful owner of the subject property. See Ill. Rev. Stat. 1989, ch. 38, pars. 16—1(a)(1), (a)(2), (a)(3), (a)(4). Section 16—1(a)(5) could thus have been applied to conduct that was *unrelated* to the purpose of this statutory section, that being to provide an effec-

tive method of breaking up fencing operations. For example, section 16—1(a)(5) could have been applied to the wholly authorized and innocent conduct of an evidence technician who lawfully obtained possession of stolen goods from an arresting officer. In these circumstances, the absence of a culpable mental state rendered section 16—1(a)(5) of the theft statute unconstitutional. *Zaremba*, 158 Ill. 2d at 38-39, 42.

Our decision in *Zaremba* was guided by this court's decision in *People v. Wick*, 107 Ill. 2d 62 (1985). In *Wick*, we held that the aggravated arson statute (Ill. Rev. Stat. 1981, ch. 38, par. 20—1.1(a)(3)) was unconstitutional because it did not bear a reasonable relationship to its purpose, *i.e.*, to punish more severely the conduct of arsonists that results in personal injury to police officers and firefighters. The aggravated arson statute did not incorporate the elements of simple arson and did not otherwise provide for a culpable mental state. Rather than applying to arsonists, the aggravated arson statute applied to anyone who knowingly damaged any structure by fire or explosive where a police officer or firefighter is injured. Accordingly, a farmer who lawfully demolished a deteriorated barn by fire, resulting in injury to a firefighter, would have been liable for aggravated arson, a Class X felony. Thus, we held that the aggravated arson statute swept too broadly by punishing innocent as well as culpable conduct in setting fires. *Wick*, 107 Ill. 2d at 66.

In *Zaremba* and *Wick*, the subject statutes irrationally criminalized lawful conduct of innocent parties not intended to fall within the scope of the statutes. In contrast, section 5—401.2 of the Vehicle Code rationally criminalizes only the conduct of licensees participating in the automotive industry, and only that conduct which is obviously and closely linked to the state's legitimate interest in preventing the transfer and sale of stolen

40

vehicles and their parts. There is no potential that the statute will reach beyond its intended target. Thus, a knowing violation of the record-keeping requirements of section 5—401.2(a) is not the type of innocent conduct that was at issue in *Zaremba* and *Wick*.

In light of the foregoing, I would hold that section 5—401.2 of the Vehicle Code is reasonably designed to achieve its purpose, and that defendant has failed to overcome the presumption that the statute is constitutional. I would thus affirm defendant's convictions for failure to keep records.