2016 IL App (1st) 134012

THIRD DIVISION
May 18, 2016

No. 1-13-4012

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 19547 |
| | ) | |
| MATTHEW GRAY, | ) | The Honorable |
| | ) | Nicholas Ford |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Matthew Gray was found guilty of aggravated battery and two counts of aggravated domestic battery. On appeal, he asserts that we must vacate his aggravated domestic battery convictions because his romantic relationship with the victim ended 15 years before the offense. Specifically, he asserts that the statute defining "family or household members" (725 ILCS 5/112A-3(3) (West 2010)) is unconstitutional as applied to his relationship with the victim. Defendant also challenges (1) the sufficiency of the evidence; (2) the admission of the victim's out-of-court statements; (3) the State's closing argument; and (4) the imposition of multiple convictions in violation of the one-act, one-crime doctrine. We agree that defendant's aggravated domestic battery convictions are unconstitutional as applied to these facts, and reverse and remand for a new trial on aggravated battery.

¶ 2                                I. BACKGROUND

¶ 3                                A. Before Trial

¶ 4     On the night of November 1, 2011, defendant and a former paramour, Tina Carthron, had an alcohol-fueled encounter. By morning, Carthron had knife wounds to her chest and back, and defendant had a bite wound to his chest. Carthron claimed that defendant, without provocation, stabbed her and choked her. In contrast, defendant acknowledged cutting Carthron's back but claimed it was done in self-defense.

¶ 5     The State charged defendant not only with aggravated battery and attempted first-degree murder, but with aggravated domestic battery as well, notwithstanding that the dating relationship between defendant and Carthron had ended 15 years before. Specifically, each aggravated domestic battery count alleged that Carthron was a family or household member as defined in section 112A-3(3) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/112A-3(3) (West 2010)). Under section 112A-3(3),"family or household members" include "persons who have *or have had* a dating or engagement relationship." (Emphasis added.) *Id*.

¶ 6     The State also moved to admit proof of other crimes against defendant's girlfriend Laura Moore, as evidence of his motive, state of mind and intent, as well as his propensity to commit domestic violence. Additionally, the State filed a motion *in limine* to present Moore's out-of-court statements to police officers in lieu of her live testimony regarding the prior incidents of domestic violence. Specifically, the State argued that the prior incidents were admissible under the excited utterance exception to the rule against hearsay. Defendant argued, however, that the prior incidents involving Moore were dissimilar and that the prejudice resulting from the admission of such evidence would outweigh its probative value. Furthermore, defendant argued

that admitting Moore's out-of-court testimonial statements to police officers would violate his right to confront the witnesses against him. The trial court ultimately ruled that the State could, through the testimony of police officers, present evidence of Moore's out-of-court statements regarding past incidents of violence for the reasons proffered by the State.[1]

¶ 7                                                    B. Trial

¶ 8      At trial, Carthron testified that approximately 15 years earlier, she and defendant dated seriously for 2 years. In addition, they had known each other for 20 years because their families were friends. In October 2011, she saw defendant a few times. Later that month, she left some clothes at his apartment at 6013 South State Street because she was going straight from there to work. Carthron testified that she and defendant were just friends and she did not want to rekindle a romantic relationship with him. She also denied asking if she could move in with him.

¶ 9      On the evening of November 1, 2011, Carthron and defendant purchased whiskey and went to his apartment, where they both drank the whiskey as well as beer. Carthron testified that she became drunk after consuming a pint of whiskey and 40 ounces of beer. At some point, defendant received a phone call from Moore, his girlfriend, and Carthron became upset. She and defendant argued but subsequently resumed listening to music and watching television. She also acknowledged testifying at a preliminary hearing, however, that she and defendant did not have an argument. Defendant went to bed but Carthron kept drinking. Eventually, Carthron removed her clothes to get ready for bed. This was not the first time she had spent the night there.

¶ 10     When Carthron awoke in the morning, apparently at about 7 a.m., she was still drunk. She and defendant argued about the phone call from Moore because Carthron thought it was disrespectful for defendant to talk to another woman while Carthron was there. Carthron testified

---

[1] While the State moved to admit other crimes evidence to show motive, state of mind, intent and propensity, the jury was ultimately instructed that it could consider other crimes evidence with respect to *modus operandi* as well.

that while she did not get physical with defendant, he choked her. Although Carthron first testified that she did not bite defendant, she later testified that she did not remember whether she bit him. In addition, Carthron testified that she passed out from being choked and regained consciousness to see defendant standing in the bathroom with a knife in his hand. Defendant then told Carthron to leave because he had called the police. As she grabbed her coat, she saw that the left side of her chest was bleeding and said, "oh, no, you didn't stab me." She also asked defendant why he called the police when he had stabbed her. With that said, Carthron did not see, feel or remember defendant stabbing her. She denied that he wiped blood from her back.

¶ 11      Carthron further testified that she left defendant's apartment with her pants, jacket, shoes and bottle, apparently referring to the bottle of whiskey, but left her cell phone, eyeglasses and underclothes behind. She saw that the police were outside defendant's apartment building but she did not approach them because she did not know what defendant had told them. Furthermore, she did not know the extent of her injuries at that time. As a result, she focused on seeking help from her daughter Suzette, who lived at 76th and South Shore. Carthron did not ask anyone on the two buses she took to get there to call 911.

¶ 12      Carthron experienced pain as she slowly climbed the stairs to Suzette's third-floor apartment.  Once inside, Carthron sat down and told Suzette that defendant stabbed her. Suzette unzipped Carthron's coat and "blood start [*sic*] shooting out" of her chest. Carthron's back hurt too. Upon removing Carthron's jacket, Suzette saw that Carthron had also been stabbed in the back. Suzette then called 911. We note that Suzette's testimony corroborated Carthron's testimony regarding her arrival at Suzette's apartment.

¶ 13      At the hospital, Carthron spoke to Detective Rapunzel Williams. Carthron did not remember telling the detective that Carthron saw defendant with a knife at 1:30 a.m. or that

defendant woke her by choking her. In addition, she did not say she passed out before being stabbed. After Carthron was discharged from the hospital, the police took her to retrieve her eyeglasses from defendant's home and then took her to the police station.

¶ 14 Before other crimes evidence was presented to the jury, defendant again argued that he and Carthron lacked the domestic relationship necessary to admit evidence regarding Moore. The trial court disagreed: "I think circumstantially that they had intercourse earlier that evening and somebody had spent the night at somebody else's house. All these things in my view establishes that there was a domestic relationship." The court then admonished the jury that evidence "received on the issues of the defendant's *modus operandi*, intent, motive, state of mind, and propensity to commit the offense of domestic battery" could only be considered for those limited purposes.

¶ 15 Officer Terry Murray testified that about 1 p.m. on September 2, 2010, he and his partner Officer Kim Williams responded to a domestic battery call at 5750 South Lafayette, where he saw defendant and his mother on the porch. When Moore eventually came outside and approached the two officers, she was agitated and holding her leg but was not bleeding. About 20 minutes had passed since the incident occurred. She said that defendant, her boyfriend, had kicked her down the stairs and hit her in the left eye. Officer Murray observed a minor bruise under her eye and a cut lip. In addition, both defendant and Moore were highly intoxicated. Officer Murray also learned that they had fought about money. No one asked Officer Murray for help but Moore did go to the hospital, for what seemed to be minor injuries. Based on information Moore gave Officer Murray in response to his questions, he arrested defendant. Moore did not, however, want to sign a complaint. The trial court then denied defendant's renewed motion to bar evidence of Moore's out-of-court testimonial statements.

¶ 16    Dr. Bhavana Vaidya testified that on September 3, 2010, she treated Moore for a left ankle fracture, a facial contusion and alcohol abuse. During their conversation, Moore said she was injured when she was hit and pushed down the stairs.[2]

¶ 17    Officer Ochoa testified that in February 2011, he and Officer Gonzalez responded to a domestic disturbance call at 7425 South Harvard Avenue, where they encountered Moore and defendant. Both appeared to be intoxicated and Moore's neck was red. In addition, Moore said that she and defendant were watching the Super Bowl when he became irate, called her names and grabbed her neck. This occurred 5 to 10 minutes before the officers arrived. Although Officer Ochoa first testified that Moore immediately made those statements upon his arrival, he also testified that she provided that information in response to his question regarding what had happened. Moore declined to have an ambulance called. Following Officer Ochoa's testimony, the trial court again overruled defendant's renewed objection to the admission of such testimony.

¶ 18    After the State rested, defendant called Detective Williams, who testified that she interviewed Carthron at the hospital. At that time, Carthron did not say defendant woke her up by choking her or that he choked her until she passed out. Carthron did say, however, that she was getting ready to leave defendant's apartment at about 1:30 a.m. when she saw that she was bleeding from her left side and that defendant was holding a knife. On the same day, Detective Williams observed that defendant had an oval-shaped red mark on his chest. Detective Williams spoke to Carthron again at the police station, following her discharge from the hospital. Carthron then said that defendant choked her.

¶ 19    Defendant testified on his own behalf that in early October 2011, he was standing in front of his building when Carthron passed by and learned that he had just moved in. Defendant had

---

[2] The State conceded at oral argument that Dr. Vaidya's testimony regarding defendant's responsibility for Moore's injuries should not have been admitted.

not dated her in 15 years and they were just friends. Later that month, Carthron had defendant keep a bag of clothing for her while she was at work. After work, she returned to collect her things and brought defendant wine. Carthron also told defendant that "she had been put out by her daughter" and asked to move into his apartment but he said no.

¶ 20    On the afternoon of November 1, 2011, defendant went to the store and purchased whiskey, cigarettes and juice for Carthron, at her request. Defendant bought wine for himself. At about 7 p.m., defendant called Carthron and told her to come over because she sounded depressed. He also told her how much she owed him for the items he purchased for her. When Carthron eventually came over for her items, she asked if she could have a cocktail.

¶ 21    Defendant and Carthron began drinking, listening to music and talking. At about 11 p.m., Moore called and defendant told her he would come over after a short nap. Defendant had dated Moore for 15 years and considered her to be his common law wife. He then gave Carthron the remote control and said he would walk her home after a short nap. When he went to sleep, she was fully dressed, sitting in a chair and having a drink. Defendant denied that an argument or sexual conduct ensued.

¶ 22    At about 7 a.m., defendant awoke to Carthron biting his chest. Carthron, who was five feet, four inches tall, also had her arm was around his waist and her leg on top of him. When defendant touched her head, she bit him harder. He yelled and told her to let him go but she bit him harder still. Defendant, who was 6 feet tall, tried to push her off but she would not let go. Furthermore, defendant testified that he kept his fingernails long and may have pushed Carthron's neck but he never put his hands around it.

¶ 23    Defendant did not want to hurt Carthron, but after telling her 10 to 20 times to let go, he looked for something to hit her with. The only item near the bed was a knife, which he kept for

security. Defendant added that he kept several knives in his home, including a knife with a protective sheath over it so he could carry it with him. After he touched Carthron's back with the knife, she continued biting him so he did it again, this time cutting her. Defendant testified that while he touched her, he did not stab her. Upon being touched a second time, Carthron released her hold on him. He then pushed her off the bed. Defendant testified it was possible that the knife made additional contact with her chest when he pushed her but he did not know at that time that her chest was bleeding.

¶ 24    Defendant went to the bathroom and saw the bite mark, which was not bleeding. After applying witch hazel to his wound, defendant returned to the bedroom where Carthron was sitting in her underwear and drinking whiskey. Defendant dabbed her back with a towel and told her he had cut her. She got up and refused to speak. After finding her clothes, defendant told her to leave before he called the police. He escorted her out of the building and called 911 after she left. Defendant also testified, however, that an ambulance was already outside his apartment when Carthron left. Furthermore, defendant denied telling a 911 operator that defendant's girlfriend had attacked him with a knife, that she bit him or that he stabbed her. He similarly did not remember telling the operator that Carthron may be badly hurt.

¶ 25    That day, defendant spoke to Detective Williams and Detective Steven Scott at the police station. Defendant denied telling the police that he patched Carthron's back but acknowledged saying that the ambulance came and took Carthron away. Defendant never obtained medical treatment for his bite wound because he had treated himself and was already on pain medication for a leg injury.

¶ 26    With respect to Moore, defendant acknowledged she had previously called the police on him. On September 2, 2010, they were drinking and she slipped on the stairs. He denied

punching her in the face or kicking her down the stairs. In addition, the police happened to be passing by and asked what was going on. Moore, who was drunk, then said that defendant pushed her down the stairs. Furthermore, defendant testified regarding another incident when defendant pushed Moore during an argument. They were both intoxicated when the police arrived.

¶ 27 In rebuttal, Marc Coit, a 911 operator, testified that at 8:02 a.m. on November 2, 2011, a caller identified himself as defendant and said that his girlfriend attacked him with a knife. The caller also said that he took the knife, stabbed her and believed she may have been badly hurt. Coit acknowledged that he had no independent recollection of that conversation.

¶ 28 Detective Scott testified that he and Detective Williams spoke to defendant, who stated that he had a verbal altercation with Carthron about his girlfriend. Defendant also said that after the altercation became physical, he patched Carthron's back. Detective Scott did not ask defendant what he meant by that. Additionally, Detective Scott saw a red mark on defendant's chest, which defendant said he sustained from Carthron biting him.

¶ 29 The jury found defendant guilty of aggravated battery and two counts of aggravated domestic battery based on him strangling and stabbing Carthron, but acquitted him of attempted murder. Defendant moved for a new trial, arguing, among other things, that the court erroneously admitted proof of other crimes into evidence. Defendant also argued that the court erred by allowing police officers to testify about Moore's hearsay statements. The trial court denied defendant's motion and sentenced him to concurrent five-year prison terms for the two counts of aggravated domestic battery and a concurrent three-year prison term for aggravated battery.

¶ 30                                      II. ANALYSIS

¶ 31    On appeal, defendant asserts for the first time that section 112A-3, which defines family or household members, constitutes an abuse of the State's police power as applied to this case because he and Carthron had not dated for 15 years. Defendant also observes that the legislature's irrational decision to treat Carthron as his family or household member allowed the State to charge him with Class 2 aggravated *domestic* battery (720 ILCS 5/12-3.3(a), (b) (West 2010)), rather than Class 3 aggravated battery (720 ILCS 5/12-3.05(a)(1), (h) (West 2010)), and allowed the State to present propensity evidence of other crimes involving violence against Moore (725 ILCS 5/115-7.4 (West 2010)). As a threshold matter, however, the parties dispute whether defendant's as-applied constitutional challenge is properly before us.

¶ 32    After the briefs were filed in this case, our supreme court, in *People v. Thompson*, 2015 IL 118151, addressed whether as-applied constitutional challenges can be raised for the first time on appeal. The parties have filed supplemental briefs addressing *Thompson*'s impact on defendant's claim.

¶ 33    In *Thompson*, the 19-year-old defendant raised an as-applied constitutional challenge to his sentence for the first time on appeal from the denial of his petition for relief under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)). *Thompson*, 2015 IL 118151, ¶¶ 6-7, 14-18. The defendant argued he could raise this claim at any time because it rendered the judgment void. *Id*. ¶ 30. Our supreme court disagreed, finding that judgments are void only where jurisdiction is lacking or where a judgment is based on a facially unconstitutional statute which is void *ab initio*. *Id*. ¶¶ 31-32, 34. Additionally, the supreme court rejected the defendant's assertion that it was illogical to permit a defendant to raise facial, but not as-applied, constitutional challenges to a sentence at any time. *Id*. ¶¶ 35-36. While a facial challenge requires demonstrating that a statute is unconstitutional under any set of facts, an

as-applied challenge requires demonstrating that the statute is unconstitutional under the particular circumstances of the challenging party. *Id*. ¶ 36. Because as-applied challenges are dependent on the particular facts, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id*. ¶ 37.

¶ 34    Defendant suggests that *Thompson* applies only to appeals from section 2-1401 petitions due to the supreme court's following statement: "Because facial and as-applied constitutional challenges are distinct actions, it is not unreasonable to treat the two types of challenges differently for *purposes of section 2-1401*." (Emphasis added.) *Id*. ¶ 37. Thus, defendant asserts that prior supreme court cases allowing appellants to raise as-applied constitutional challenges for the first time on direct appeal remain valid. See e.g. *People v. Johnson*, 225 Ill. 2d 573, 577-78, 592 (2007); *In re J.W.*. 204 Ill. 2d 50, 61-62, 68-69, 73-74 (2003); see also *People v. Wright*, 194 Ill. 2d 1, 23-24, 29 (2000) (where the defendant raised facial and as-applied constitutional challenges for the first time in a petition for rehearing, the court found the defendant's assertions were properly before it but ultimately, did not address the defendant's as-applied challenge). In light of *Thompson*'s rationale, however, we find no distinction between as-applied challenges first raised on direct appeal and those first raised on appeal in collateral proceedings.

¶ 35    Instead, *Thompson*'s rationale rests on the notion that reviewing courts require a sufficient evidentiary record in order to determine whether a statute is unconstitutional as applied to a particular defendant. See *Thompson*, 2015 IL 118151, ¶ 38 (finding the record before it contained "nothing about how that science applies to the circumstances of defendant's case" or "any factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18"); see also *People v. Mosley*, 2015 IL 115872, ¶ 47 (finding that courts cannot make as-applied determinations without an evidentiary record and findings of

fact). Accordingly, we find *Thompson*'s rationale reflects a distinction between as-applied challenges that lack a sufficient record due to being raised for the first time on appeal and as-applied challenges supported by a sufficiently developed record for appellate review, despite the defendant's failure to raise the issue in the trial court.

¶ 36    Contrary to the State's contention, the evidentiary record is sufficient to review defendant's claim. Defendant's case proceeded to a trial, at which the parties explored the nature of defendant's relationship with Carthron. *Cf. Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 227-28 (2010) (where the circuit court granted judgment on the pleadings without an evidentiary hearing or factual findings, the trial court improperly found a statute was unconstitutional as applied);  *Mosley*, 2015 IL 115872, ¶¶ 45-49 (rejecting the defendant's as-applied constitutional claim where the record lacked pertinent evidence regarding the defendant's as-applied constitutional claim even after a bench trial). While the State argues that we lack a necessary factual finding regarding whether defendant and Carthron engaged in sexual intercourse on the night in question, we find this argument to be both disingenuous and lacking in merit. The State's opening statement and closing arguments referred to defendant as Carthron's friend and ex-boyfriend. Additionally, the State argued before the jury that Carthron constituted a family or household member because they formerly dated.  In stark contrast, the State never suggested Carthron's testimony that they had sex that night would support finding that she was defendant's household or family member. Furthermore, the State does not suggest that it actually had further evidence to present on this matter. More importantly, as we will discuss, an isolated sexual encounter does not constitute a dating relationship, notwithstanding the trial court's comments suggesting otherwise. Thus, even assuming the jury believed Carthron's testimony that

she had sexual intercourse with defendant on the night of the offense, it would not have established a dating relationship within the meaning of section 112A-3(3).

¶ 37                                 A. Dating Relationship Defined

¶ 38    Defendant was charged with aggravated domestic battery, which requires, among other things, that he committed domestic battery. 720 ILCS 5/12-3.3(a), (a-5) (West 2010). In addition, a person commits domestic battery by causing bodily harm to, or making insulting or provoking contact with,"any family or household member." 720 ILCS 5/12-3.2 (West 2010). Furthermore, section 112A-3(3) of the Code states that family or household members "include *** persons who have or have had a dating or engagement relationship ***. For purposes of this paragraph, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship."[3] 725 ILCS 5/112A-3(3) (West 2010).  We note that this definition is, in all pertinent respects, identical to the definition found in the Illinois Domestic Violence Act of 1986 (DVA) (750 ILCS 60/103 (West 2010)), which was designed "to prevent abuse between persons sharing intimate relationships." *Glater v. Fabianich*, 252 Ill. App. 3d 372, 376 (1993); see also 750 ILCS 60/102 (West 2010) (requiring that the DVA be liberally construed to support victims' efforts to avoid further abuse, to clarify law enforcement's responsibilities, to expand remedies, to recognize that domestic violence is a serious crime and to recognize the legal system's past ineffectiveness).

¶ 39    This court has held that section 112A-3(3) requires a dating relationship to have a romantic focus. *People v. Irvine*, 379 Ill. App. 3d 116, 124-25 (2008); see also *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 651-53 (2003) (finding that under the DVA, "dating relationship" referred to a serious courtship). One date and a brief, nonexclusive relationship do not constitute

---

[3] The jury instruction defining family or household members omitted the language specifying that ordinary fraternization does not constitute a dating relationship.

a dating relationship. *Irvine*, 379 Ill. App. 3d at 124; see also *Alison C.*, 343 Ill. App. 3d at 650, 653 (finding that the defendant's conduct in touching the plaintiff's breasts and attempting to put his hand down her pants during a so-called "lunch date" did not constitute a dating relationship). Furthermore, this court has found that where both the defendant and the victim testified they were not in a dating relationship, the State failed to prove they had a dating relationship within the meaning of 112A-3(3), notwithstanding that they had shared approximately 15 sexual encounters. *People v. Howard*, 2012 IL App (3d) 100925, ¶¶ 5, 10.[4]

¶ 40    In this Tinder age of hook-ups and one-night stands, adults both young and old can readily recognize that sexual intercourse does not itself always relate to a dating relationship or any form of serious romantic attachment.  In addition, no other facts in this case would support a determination that defendant and Carthron were presently involved in a dating relationship. Specifically, Carthron testified that she and defendant were just friends and that their dating relationship had ended more than 15 years prior. Defendant also testified that he and Carthron were just friends. Although the 911 operator testified that defendant reported that "his girlfriend attacked him," this does not change the result, since even the victim herself has testified that she was not his present girlfriend. We now determine whether the definition of family or household members can constitutionally be applied to their past relationship.

¶ 41                              B.  Past Dating Relationship

¶ 42    Statutes are presumed to be constitutional and the party challenging a statute's constitutionality has the burden of demonstrating otherwise. *Wright*, 194 Ill. 2d at 24. Additionally, due process principles prohibit only the unreasonable or arbitrary use of police power. *People v. Wilson*, 214 Ill. 2d 394, 402 (2005). Where no substantial right is at issue, we

---

[4] We note that notwithstanding this body of case law, the State suggested to the jury that not even the previous relationship between defendant and Carthron was required to have been serious in order to constitute a dating relationship.

apply the rational basis test to determine whether due process is satisfied. *Wright*, 194 Ill. 2d at 24. Defendant concedes that the rational basis test applies here.

¶ 43 Under this test, legislation will be upheld so long as it bears a reasonable relationship to a public interest and the means adopted are reasonable for accomplishing the objective desired. *Id*. While the means adopted by the legislature must constitute a reasonable method of accomplishing the result desired, courts are not concerned with whether the legislature has chosen the best or most effective means of addressing the problem at hand. *Wilson*, 214 Ill. 2d at 402. The legislature's judgment may be based on rational speculation rather than evidence or empirical data. *People v. Boeckmann*, 238 Ill. 2d 1, 7 (2010). With that said, this highly deferential review is not toothless. *Id*.

¶ 44 Defendant essentially asserts that the statue's lack of a timeframe for prior dating relationships undermines the legislature's decision to exclude casual acquaintances and ordinary fraternization from the definition of dating relationships, and in turn, family or household members. Defendant urges us to read into this statute a reasonable time limitation on prior dating relationships. We find our supreme court's decision in *Wilson* to be instructive.

¶ 45 In *Wilson*, our supreme court rejected the trial court's determination that section 112A-3(3) was unconstitutionally vague as applied to parties who had not dated for several months. *Wilson*, 214 Ill. 2d at 397-99. Specifically, the trial court had determined that the statute was vague because it failed to place any time limits on former dating relationships. *Id*. The supreme court disagreed, finding the defendant's argument that the statute failed to set a time limit showed that the defendant understood exactly what the statute meant. *Id*. at 400-01. Furthermore, the supreme court found that while the trial court's true concern had been whether the statute constituted a valid exercise of the legislature's police power, the defendant had conceded that the

15

threat of domestic violence does not end when a relationship does. *Id*. at 402-03. Finally, our supreme court found it was irrelevant "[w]hether it was reasonable to include relationships that had ended 50 years ago," because the defendant's as-applied challenge depended only on the specific facts of the case before the court. *Id*. at 403. Because the defendant's relationship with the victim ended only a few months before the incident, his as-applied challenge failed.

¶ 46    Thus, section 112A-3(3) is unequivocal to the extent that all individuals who have engaged in past dating relationships constitute family or household members of their respective former paramours, regardless of when the dating relationship occurred. Although defendant contends "there must be a certain point when a past dating relationship or prior cohabitation becomes a casual acquaintanceship or ordinary fraternization," the plain language of the statute provides otherwise.  The question before us is whether the legislature's decision to treat defendant and Carthron as each other's family or household member under the particular circumstances of this case bears a reasonable relationship to a public interest.

¶ 47    Based on the above case law, the State has an interest in preventing abuse between persons who share an intimate relationship. In addition, a couple's romantic intimacy may conceivably outlive the duration of a dating relationship and, thus, contribute to abuse occurring after the romantic relationship has officially ended. With that said, the record here does not suggest that defendant and Carthron's relationship at the time of the offense was still under the effect of the romantic intimacy from their relationship that ended 15 years earlier. Even assuming they were physically intimate on the night of the offense, the record does not indicate that this occurred as a result of their prior relationship. We further recognize that police officers may in some instances find it difficult to identify when a relationship is domestic in order to discharge their duties. Yet, in this case, defendant could just as easily have been arrested for the

16

nondomestic offenses. In fact, the State originally charged defendant with only aggravated battery and later amended the charges to include aggravated domestic battery. Additionally, the State has not identified any objective that would be furthered by treating Carthron as defendant's family or household member. We find defendant has met his burden of demonstrating that treating Carthron as his family or household member is not reasonably related to a public interest and that, as applied to them, section 112A-3(3) is unconstitutional.

¶ 48    In light of our determination, we vacate defendant's convictions for aggravated domestic battery. Defendant also contends, however, that we must reverse and remand for a new trial on defendant's aggravated battery conviction because the jury heard other crimes evidence involving Moore that it would not have heard absent the domestic charges. The State has not responded to this contention.

¶ 49    First, we remind defendant that other crimes evidence was admitted as evidence of defendant's motive, *modus operandi*, state of mind and intent, not just his propensity to commit domestic violence. With that said, the trial court may or may not have determined that prejudice outweighed the probative value of such evidence if it was not admissible as evidence of propensity, particularly considering that defendant has now been acquitted of attempted first-degree murder and that defendant's identity is not at issue. See *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 44 (observing that "[*m*]*odus operandi* acts as circumstantial evidence of identity").  In addition, the jury may have found it difficult to consider defendant's other crimes as evidence of his propensity to commit only aggravated *domestic* battery, rather than aggravated battery. Accordingly, we agree that further trial court proceedings are warranted. In light of our determination, we need not consider defendant's contention that the trial court improperly admitted Moore's hearsay statements through the testimony of police officers (an issue that may

be revisited on retrial), that the prosecutor committed misconduct during closing arguments or that defendant's aggravated battery conviction violates the one-act, one-crime doctrine.

¶ 50                              C. Sufficiency of the Evidence

¶ 51      We must, however, briefly address the sufficiency of the evidence. *People v. Ward*, 2011 IL 108690, ¶ 50 (stating that before trial is permitted, the double jeopardy clause requires courts to determine whether sufficient evidence was presented at the original trial). Specifically, reviewing courts must determine if, when viewing the evidence in the light most favorable to the prosecution, any reasonable jury could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. In addition, a conviction will not be reversed unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt with respect to the defendant's guilt. *Id*. Furthermore, the jury is entitled to weigh the evidence, assess the witnesses' credibility, resolve conflicts in the evidence and draw reasonable inferences. *People v. Washington*, 2012 IL 110283, ¶ 60.

¶ 52      The jury was instructed that in order to sustain the aggravated battery charge, the State was required to prove that defendant knowingly caused Carthron bodily harm, that he used a deadly weapon in doing so and that defendant was not justified in using the force that he used. See 720 ILCS 5/12-3.05(a)(5), (f)(1) (West 2010). The State presented sufficient evidence to support each element of the offense. Carthron sustained knife wounds to her back and chest. It is undisputed that she and defendant were the only two people in his apartment. In addition, defendant acknowledged touching Carthron's back with the knife. While defendant explained it was "possible" that the knife made contact with Carthron's chest as he pushed her off of him, the jury was not required to believe her chest wound resulted from an unintentional mishap. Based on the evidence presented, the jury was entitled to find that defendant deliberately inflicted both

wounds to harm Carthron, not to get her to release her bite and not as a mere accident that occurred while pushing her off of the bed.

¶ 53    While defendant asserts that Carthron's level of intoxication "eviscerates" her credibility, the jury, rather than this court, is the best judge of how alcohol affected her. *People v. Ayers*, 331 Ill. App. 3d 742, 755 (2002). To be sure, Carthron's testimony suffered from inconsistencies and poor recollection, just as defendant's testimony suffered from inconsistencies and self-interest. Both witnesses' account of events could at times be considered illogical. Furthermore, we remind defendant that the record shows Carthron was not the only person drinking at the time of the offense: thus, the jury was not required to find that Carthron's account of defendant's irrational use of violence rendered her testimony improbable. See *People v. Andersen*, 134 Ill App. 3d 80, 86 (1985) (observing that individuals under the influence of alcohol "may become totally irrational, unable to perceive reality, and may lose control over their behavior"). Based on the evidence presented, a jury could find that defendant was the only individual who could have inflicted Carthron's knife wounds and that stabbing her was unjustified, even if she did bite him. Accordingly, the evidence was sufficient to sustain defendant's conviction and he may be subjected to a new trial.

¶ 54                                   III. CONCLUSION

¶ 55    Under the specific facts before us, the legislature's decision to treat Carthron as defendant's household or family member is not rationally related to a public interest. Accordingly, we find the statute defining household or family members is unconstitutional as applied to this defendant and vacate his aggravated domestic battery convictions. We also remand for a new trial on aggravated battery. At that time, the trial court will have the

opportunity to determine whether the probative value of other crimes evidence still outweighs the potential prejudice now that the domestic charges are no longer at issue.

¶ 56    For the foregoing reasons, we vacate defendant's aggravated domestic battery convictions and reverse and remand for a new trial on defendant's aggravated battery conviction.

¶ 57    Vacated in part; reversed in part and remanded with directions.